*UNITED STATES DISTRICT COURT*
*DISTRICT OF MAINE*

| | | |
|---|---|---|
| *UNITED STATES OF AMERICA* | ) | |
| | ) | |
| *v.* | ) | *Criminal No. 05-81-P-H* |
| | ) | |
| *JUAN CASTILLO, a/k/a* | ) | |
| *LUIS ARROYO, JR.* | ) | |
| | ) | |
| *Defendant* | ) | |

### RECOMMENDED DECISION ON MOTION TO SUPPRESS

Juan Castillo, also known as Luis Arroyo, Jr., charged with knowingly and intentionally possessing, with intent to distribute, a substance containing cocaine in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(C) and being a felon in possession of a firearm (a Norinco model SKS and ammunition) in violation of 18 U.S.C. §§ 922(g)(1) and 924(a), *see* Indictment (Docket No. 1), seeks to suppress statements made and evidence seized following a warrantless entry of his home in Lewiston, Maine, on July 14, 2004. *See generally* Motion To Suppress Evidence ("Motion To Suppress") (Docket No. 27). An evidentiary hearing was held before me on February 7, 2006 at which the defendant appeared with counsel. Immediately following the close of evidence, counsel were afforded the opportunity to argue orally. Counsel for the defendant chose to supplement his papers with brief oral argument. I now recommend that the following findings of fact be adopted and that the Motion To Suppress be granted in part and denied in part.

### I. Proposed Findings of Fact

On July 14, 2004 a group of federal drug agents and Lewiston, Maine police officers set up surveillance of the home of the defendant at 187 Pine Street in Lewiston, Maine ("187 Pine").

Approximately one or two weeks earlier, Lewiston Police Department ("LPD") officer Gregory Boucher, who had been assigned since early 2004 to a federal Drug Enforcement Agency ("DEA") task force based in Portland, Maine, had learned from a confidential informant with whom he had been dealing for some time on a large case and whom he had found very reliable ("CI #1") that Luis Arroyo of 187 Pine Street was dealing cocaine. CI #1 told Boucher that Arroyo was a male of Latino descent and average height and weight who was living at that location with his cousin or another family member. CI #1 further related that he had been to "Luis's" house on cocaine-buying trips on one or two occasions with another male whom the task force was investigating at the time.[1] Finally, on July 11 or 12, 2004 CI #1 told Boucher that an associate of CI #1's who was one of Arroyo's customers and who had been to 187 Pine on numerous occasions to buy cocaine ("Source #2") had been threatened by Arroyo once or twice. Specifically, CI #1 told Boucher that Source #2 had told him that Arroyo had placed a knife against Source #2's finger and threatened to cut it off if Source #2 did not pay Arroyo $1,000 that Source #2 owed him.

CI #1 was not Boucher's only source of information regarding activities at the defendant's home. Boucher, who himself lives and owns property in the vicinity of 187 Pine, had been approached by at least two people who lived in close proximity to the defendant's residence who informed Boucher that they had observed large amounts of foot traffic in and out of the home, with people staying for only short periods of time. Boucher also personally observed this activity and saw individuals whom he knew to be drug users visiting the residence. Finally, on July 12, 2004 Boucher received a call from Wayne Clifford, an LPD officer assigned to a plainclothes division known as the Selective Enforcement Team, or "SET," that he had been told by yet another source ("Source #3") that

---

[1] On cross-examination, Boucher acknowledged that, in violation of the terms of CI #1's contract as an official confidential informant, CI #1 did not obtain authorization from police to participate in the cocaine-buying trips to 187 Pine. However, Boucher testified that in the street-level drug world these sorts of things happen, and that this particular rule-breaking did not undermine his belief in CI #1's (*continued on next page*)

Source #3 had purchased drugs on several occasions from "Luis" at 187 Pine and that "Luis" was a dangerous guy. Clifford and Boucher decided to set up a joint surveillance of 187 Pine by members of the DEA task force and the SET.

At approximately 2 p.m. on July 14, DEA task force agent Steven Thibodeau parked a van, in which were secreted several officers, across the street from 187 Pine.[2] Earlier that day, participating officers had been briefed regarding reported activities at the residence. Pine Street is a one-way street, and the van was parked near its intersection with Bradley Street. Boucher occupied the front passenger seat; in the rear were several others, including DEA task-force agents Ernest MacVane and Chris Godbout. Tinted windows and curtains shielded the officers from public view. The van's occupants remained in touch with LPD officers, some of whom were maintaining "mobile surveillance," through radio communications. The defendant's residence was surrounded on both sides by three- or four-story buildings that were close to the curb. His residence, however, was set well back from the street, with a thirty- or forty-foot-long driveway, and partially tucked behind one of the adjacent buildings. From his vantage point in the front seat Boucher could not see the front door of 187 Pine, which was approximately ninety-five feet from the van. He was aware that 187 Pine also had a side door leading to a fenced-in courtyard and then to a parking lot fronting Bradley Street, although he could not see the side door, either.

After five or ten minutes Boucher heard one of the agents in the rear of the van report that a car had pulled up behind the van and a male had exited and headed for 187 Pine while two other people, a male and a female, remained in the car. MacVane was able to, and did, personally observe these events.[3] About three minutes later Boucher spotted a male exiting an alleyway between two other

---

reliability.

[2] For ease of reference, I shall refer to both drug-enforcement agents and LPD officers collectively as "officers."

[3] At hearing, MacVane testified that he remembered seeing the male walk to the front door of 187 Pine, which was clearly visible from
(*continued on next page*)

3

buildings, 191 and 193 Pine Street, that were on the same side of the street as 187 Pine but closer to

the intersection with Bradley Street. MacVane also observed a male walking briskly across Pine

Street in the direction of the car parked behind the van. He called out that this was the same male who

had just entered 187 Pine and that he (the male) had something in his hand that appeared to be a plastic

baggie. Both Clifford and LPD Officer Richard Stanton, who were conducting surveillance from a

separate vehicle, overheard this report via radio. The male reentered the parked car, which pulled out

in front of the van and made a left turn onto Bradley Street. On Boucher's instruction, Thibodeau

followed the vehicle. From Bradley Street it turned onto Ash Street. It had not gone far when Boucher

observed it roll through a red light at the corner of Ash and Bates streets without stopping. He

observed no other traffic violations. Boucher radioed for an LPD officer in a marked cruiser to stop

the car. Approximately eight blocks from 187 Pine, LPD Officer Trent Murphy did so. MacVane

approached the male whom he had observed entering and exiting 187 Pine, while Boucher approached

the second male occupant of the car. As MacVane drew near, he observed the male whom he had

targeted for questioning moving around in the backseat. He could not see the male's hands, causing

him concern for his safety. He ordered the male out of the car, commanding, "Give me your cocaine,"

and faced him with an outstretched hand. The male, who identified himself as Philip Tarmey,

responded, "It's in my pocket." Tarmey hesitantly retrieved a knotted plastic sandwich bag containing

white powder from a pocket on the leg of his cargo pants and gave it to MacVane. By this time

Stanton had joined MacVane. Tarmey told both officers that he had purchased the cocaine at 187 Pine

for twenty dollars from a dark-skinned male. Tarmey, who seemed to both MacVane and Stanton to be

reluctant and to MacVane to be afraid, declined to say any more, commenting that the seller would kill

him. In Stanton's presence, MacVane conducted an immediate chemical field test of the substance in

---

his position in the rear of the van, but could not recall having seen him actually enter the residence.

4

the baggie, which tested presumptively positive for the presence of cocaine. One or more uniformed LPD officers took Tarmey to the LPD station.

Following this roadside stop, which lasted about fifteen minutes, members of the surveillance team regrouped, meeting in the parking lot of a nearby business for about ten minutes. MacVane reported that he had received cocaine from Tarmey and, although Tarmey was reluctant to disclose its source because he was in fear the supplier would kill him, he had confessed that he had obtained it at 187 Pine. The surveillance team decided to "secure" 187 Pine and apply for a warrant to search it. At about 3 p.m. the team entered the residence. Boucher and Stanton stationed themselves at the side door, while several other officers, at least some of whom had guns drawn and some of whom were in uniform, approached the front door. Those at the front knocked and identified themselves as police. Upon hearing no response, they attempted to break down the front door with a battering ram but were unable initially to do so. Boucher and Stanton, overhearing this difficulty, separately broke in through the side door and met up inside the home with fellow team members, who had just succeeded in breaking in through the front door. Officers and agents commenced a protective sweep. MacVane swept through the kitchen, bathroom and living room downstairs. Stanton and Clifford were among those who went upstairs, while Boucher remained on the first floor in the kitchen area, monitoring the front door for potential cocaine customers.

Officers who went upstairs discovered a man, a woman and two children in a bedroom and ordered the adults to the floor to be handcuffed. Initially, at least some of the officers had guns drawn. Clifford did not point his weapon at the occupants but, consistent with standard practice, held it at "low-ready" until the two adults were handcuffed. MacVane went upstairs, where he observed one or two children running around and two adults, a man and a woman, lying on their stomachs on the floor with their hands handcuffed behind them. The man – the defendant – was escorted downstairs to the

kitchen area, while the female – his girlfriend Luemily Melendez – was left upstairs with the children. It is standard practice to separate inhabitants of a house after they are taken into custody.

Once the sweep ended and the two adult occupants of the residence had been handcuffed, Boucher moved the van and obtained an evidence kit. He then set up an evidence station at the kitchen table of 187 Pine. MacVane approached the defendant, introduced himself, showed the defendant his credentials, asked him his name and, in the presence of Thibodeau, read him *Miranda* warnings from a standard-issue task-force card.[4] Thibodeau heard and saw (i) MacVane read the defendant *Miranda* warnings from the standard-issue card, and (ii) the defendant agree to waive his *Miranda* rights and speak to the officers. MacVane asked the defendant where he kept the cocaine. The defendant, who informed MacVane he resided at 187 Pine with his girlfriend, replied that the cocaine was in his bedroom closet upstairs. MacVane asked if he could search the closet, and the defendant said yes. MacVane, accompanied by Thibodeau, went upstairs and peered into the closet, immediately spotting one or two knotted plastic bags containing white powder. MacVane called Boucher to come upstairs. Boucher did so, and MacVane showed him a bag that he said he had retrieved from an upstairs closet. MacVane told Boucher he had received consent from the defendant to search the closet. MacVane field-tested the powder. The test was positive for the presumptive presence of cocaine.

MacVane and Stanton then left 187 Pine and went to LPD headquarters, where Stanton weighed the plastic baggie or baggies retrieved from the closet and, with assistance from MacVane, drafted an affidavit in support of a request for a search warrant. The affidavit stated, in relevant part, that Stanton had probable cause to believe the crime of unlawful trafficking in scheduled drugs was taking place at 187 Pine and that evidence of that crime was located within the residence inasmuch as:

---

[4] Per *Miranda v. Arizona,* 384 U.S. 436 (1966), an accused must be advised prior to custodial interrogation "that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires." *Miranda*, 384 U.S. at (*continued on next page*)

2.  On 07-14-2004 [Stanton] met with TFA Gregory Boucher of the New England H.I.D.T.A. During [their] meeting TFA Boucher advised [Stanton] that he had information from a confidential source known hereafter as the (CS) that two males of Dominican descent were selling large amounts of cocaine from 187 Pine Street.

3.  TFA Boucher also told [Stanton] that he has received information from neighbors living in the area of 187 Pine [S]treet that detailed an unusual amount of vehicular and pedestrian traffic at 187 Pine Street. According to TFA Boucher, the people visiting 187 Pine Street only visit for a short time and arrive at all hours of the day and night. [Stanton], based on [his] training[,] education and experience[,] know[s] that this type of activity is consistent with drug trafficking.

4.  On 07-14-2004 [Stanton], along with agents of the federal Drug Enforcement Administration (DEA) and the Lewiston Police Department (LPD)[,] conducted surveillance at 187 Pine Street. During the surveillance detail, TFA Boucher advised [Stanton] that several persons were observed entering and exiting the residence in short intervals of time.

5.  TFA Ernest W. MacVane III of the DEA then told [Stanton] that he observed a white male enter 187 Pine Street. The white male was observed entering the residence th[r]ough the main entryway, which was accessed from Pine Street. The white male visited the residence for approximately 3 minutes and was then observed exiting the residence.

6.  The white male was observed as he walked from the residence towards Pine Street. While he was walking, TFA MacVane observed the white male carrying what seemed to be a plastic baggie. The white male entered the rear seat of a small car on Pine Street, which was occupied by a female driver and a male passenger.

7.  Agents maintained constant surveillance of the passenger car as it traveled from Pine Street to Main [S]treet. During surveillance the passenger car was observed rolling through stop signs and changing lanes without signaling, (violation of Maine traffic laws). The Passenger was stopped by the Lewiston Police Department on the Corner of Main Street and Middle Street.

8.  TFA MacVane observed the white male in the rear passenger seat moving about the interior of the vehicle in a furtive manner consisten[t] with concealing evidence and[/]or weapons. TFA MacVane told the white male to exit the vehicle. Once outside the vehicle, TFA MacVane asked the white male to "turn over your cocaine"[;] the white male stated, "It[']s in my pocket". TFA MacVane then recovered approximately 1-gram of cocaine.

478-79.

9.      [Stanton] positively identified the white male who was observed by agents as he exited 187 Pine Street as [**redacted**] with his Maine State photo drivers license.  [**Redacted**] told agents that he purchased the cocaine, which was recovered from his pocket[,] from 187 Pine Street during his recent brief visit.  [**Redacted**] told agents that he had purchased the cocaine from a dark skinned male for $20.00.  [**Redacted**].

10.     Agents responded to 187 Pine Street to secure the residence in anticipation of a search warrant.  The residence was secured secondary to the large amount of pedestrian traffic in and out of the residence.  Agents feared that cocaine would continuously be distributed from 187 Pine Street, thus reducing the amount of cocaine/evidence at the residence and placing the community at greater risk.  While securing the residence, agents identified Louis ARROYO as an occupant and tenant of the residence.  ARROYO advised that he resides at the residence with Luemily MENLENDEZ.  ARROYO was advised of his rights pursuant to Miranda.  ARROYO waived his rights and told agents that he was in possession of cocaine.  ARROYO told TFA MacVane that his cocaine was in []his closet and further granted limited consent to search the closet.  Upon searching the closet, TFA MacVane recovered approximately 1-ounce of a white powdery substance (later weighed at the LPD as 33 grams of white substance) in a clear plastic baggie.  The suspected cocaine was chemically field tested by TFA MacVane and resulted in the positive result for the presumptive presence of cocaine.

11.     In speaking with MDEA S/A Roland Godbout, S/A Godbout advised that [**redacted**] is known by the agency as being involved with the distribution of cocaine and cocaine base in the Lewiston-Auburn areas.

12.     On or about 07-12-2004 [Stanton] received information from an anonymous source (AS) that a Dominican male at 187 Pine Street was trafficking drugs and is in possession of a firearm.  Currently LPD officers and agents of the DEA have secured 187 Pine Street pending the application for a search warrant.

Defendant's Exh. 4 ¶¶ 2-12.

The affidavit contained no details about Boucher's personal, familial or financial interests in the Pine Street neighborhood.  Boucher testified that this information was omitted because he and other officers were confident it was unnecessary to establish probable cause and because he did not want to reveal any information that might jeopardize the safety of CI #1 or anyone living in the vicinity of 187 Pine.

8

While at the LPD station, MacVane and Stanton again spoke with Tarmey.  At approximately 4 p.m. Stanton read Tarmey his *Miranda* rights, which Tarmey waived in writing.  *See* Defendant's Exh. 3.  Tarmey then provided a written statement that differed materially from the statement he had given MacVane at the roadside stop.  *See id*.  In his written statement, Tarmey stated that after retrieving his keys (from 187 Pine) he was pulled over with a friend's mother, whereupon an officer found a small bag of cocaine on him.  *See id*.  His written statement omitted any mention of having obtained the cocaine at 187 Pine.  *See id*.[5]

Either just before or just after MacVane and Stanton left 187 Pine to go to the LPD station, two other officers arrived: special agent Trevor Campbell of the Central Maine Violent Crime Task Force ("CMVCTF") and his fellow CMVCTF member Christopher Clifford, a deputy United States marshal. Earlier that day Campbell had been informed by Source #2, with whom he had been directly dealing, that Arroyo had threatened him.  Specifically, Source #2 told Campbell that two Hispanic men at 187 Pine, whom he believed were brothers, had threatened him by placing an assault rifle to his head with a potato affixed to its end.  Campbell surmised that the potato had been attached to the rifle for the purpose of silencing any shot fired.  Approximately fifteen minutes after Campbell learned this information, Christopher Clifford phoned him to request that he report to 187 Pine.

---

[5] The defendant subpoenaed Tarmey to appear as a witness at his suppression hearing.  Tarmey testified that he did visit 187 Pine on July 14, 2004, but did so for the sole purpose of retrieving keys he had left there.  He stated that when he departed 187 Pine the only thing he had in his hand was the keys.  He flatly denied having purchased cocaine that day at 187 Pine or having told police that day that he had done so or that he was afraid of the seller.  He further denied that the defendant, whom he knew as "Lee," was his drug dealer or that he was aware the defendant sold cocaine.  He described the defendant as an acquaintance whom he met when he sold him a dog and with whom he had occasional drinks.  He testified that prior to July 14, 2004 he had been regularly using cocaine but had entered rehabilitation.  He testified that, upon his discharge from rehabilitation on July 13, 2004 he "slipped" and bought cocaine that evening (from someone other than the defendant) but did not use it all up that night.  He testified that the cocaine baggie was already in his pants pocket when he entered 187 Pine.  The testimony of Tarmey, then a regular cocaine user, that the defendant was merely an acquaintance and that he visited him on July 14, 2004 solely to retrieve keys strains credulity.  To the extent there could be a doubt, Clifford testified that after LPD officers stopped the car in which Tarmey was riding on July 14, he approached the driver, Barbara Tatu, whom he knew personally, and Tatu told him she was aware that Tarmey had been to 187 Pine to purchase cocaine.

After Campbell and Christopher Clifford arrived at 187 Pine, Melendez and the children were permitted to leave the house. Thibodeau escorted the defendant, who remained handcuffed, to a couch in the living room. During this interval Campbell, Christopher Clifford and Thibodeau questioned the defendant. Among other things, Thibodeau inquired what illegal items agents could expect to find when they searched the house. The defendant told Thibodeau he would find a rifle in the basement that he (the defendant) was holding for a friend. Campbell asked the defendant if he had handled the rifle, and the defendant said he had. Campbell then inquired what the defendant intended to use it for; the defendant said target practice.

MacVane and Stanton presented their search-warrant request and affidavit to a justice of the peace, who granted it at 6:15 p.m. They returned straightaway to the residence, whereupon a search was conducted. MacVane searched the upstairs bedroom closet more thoroughly, locating additional bags of cocaine strewn haphazardly amid the closet's contents – a total of about ten bags in all. He confronted the defendant with this discovery, saying, "I found the rest of your cocaine in the closet. Let me guess. You heard us coming and you threw it in the closet?" The defendant confirmed that he had. All of the bags found in the closet were knotted, with excess packaging cut away. The bag retrieved from Tarmey was also knotted but did not have excess packaging cut away. Other officers and agents seized additional items. Wayne Clifford found a plastic sandwich bag filled with white powder in a bedroom dresser drawer and a digital scale commonly used to weigh contraband. Campbell retrieved an SKS assault rifle and ammunition clip from behind a washing machine in the basement, and an LPD officer, Brian Rose, found a .40-caliber magazine for a pistol under a bed.

By all accounts, the defendant was very cooperative with officers on July 14, 2004. He was also described as gentlemanly and as calm. Christopher Clifford overheard him saying something to the effect, "I'll tell you anything you want to know. Just let my wife go." No one searched the home

prior to MacVane's search of the closet, and no one searched it in between that time and the time officers and agents procured a search warrant.[6]

## II.  Discussion

The defendant advances six arguments in support of the instant motion:

1.      Certain information presented in the Stanton affidavit was obtained as a result of an illegal entry of the defendant's home.  *See* Motion To Suppress at 4-5.  As a result, that information must be excised in determining whether the affidavit supplies probable cause for the requested search of 187 Pine.  *See id*. at 5.  If the search warrant as edited does not supply the requisite probable cause, evidence found during the search must be excluded from trial.  *See id*.  In addition, evidence (both tangible and statements) found during the "warrantless search" – that is, prior to issuance of the search warrant – must be excluded from trial.  *See id*.  The defendant describes this class of evidence as consisting of his identity, his presence at the house, his statement that he lived at the house, his statements evidencing knowledge of the cocaine in the house and the cocaine itself.  *See id*.

2.      The defendant is entitled to a hearing pursuant to *Franks v. Delaware*, 438 U.S. 154, 155-56 (1978), on the basis of a substantial showing that the Stanton affidavit contains false statements made with knowledge of their falsity or reckless disregard for the truth.  *See id*. at 5-7.

3.      The Stanton affidavit, when stripped of the fruits of the illegal entry and false statements, does not support a finding of probable cause.  *See id*. at 8-9.

4.      The defendant was arrested without probable cause, and all evidence gathered as a result of his unlawful arrest should be excluded as fruit of the poisonous tree.  *See id*. at 9-10 (citing *Wong Sun v. United States,* 371 U.S. 471 (1963)).  That evidence, he explains, consists of his

---

[6] Although, in the Motion To Suppress, the defendant contended that police had eaten his food while in his home and  had been physically abusive to him, *see* Motion To Suppress at 2, officers who testified denied that they had either personally done these things or observed anyone else doing so.  There was no evidence to the contrary.  I find that none of the officers or agents who were present (*continued on next page*)

presence at the house, his statement that he lived at the house, his statement that he knew where the cocaine was located and the cocaine found in the closet. *See id.*

5.      The defendant was subjected to custodial interrogation without benefit of *Miranda* warnings. *See id.* at 10-11. Accordingly, he argues, his statement that exhibited his knowledge of the location of the cocaine, as well as the cocaine itself, must be suppressed from evidence during trial and extracted from the Stanton affidavit in determining whether the affidavit established probable cause for the requested search. *See id.* at 11.

6.      Any confession by the defendant regarding the location of drugs and consent to search was involuntary. *See id.* at 11-14. As a result, he contends, neither any such confession nor any evidence gathered pursuant to the purported consent can be admitted into evidence at trial. *See id.* at 11.

The defendant's second point no longer is in issue; I ruled against his request for a *Franks* hearing. *See* Docket Nos. 34, 44. With respect to the remaining points, I determine that:

1.      The warrantless entry of the defendant's home on July 14, 2004 was illegal.

2.      Pursuant to *Wong Sun*, the fruits of an illegal entry must be suppressed unless the government can demonstrate that an exception applies. *See, e.g., United States v. Rivas*, 157 F.3d 364, 368 (5th Cir. 1998) ("Under the 'fruit of the poisonous tree' doctrine, all evidence derived from the exploitation of an illegal search or seizure must be suppressed, unless the Government shows that there was a break in the chain of events sufficient to refute the inference that the evidence was a product of the Fourth Amendment violation."); *United States v. Bienvenue*, 632 F.2d 910, 913 (1st Cir. 1980) ("Evidence obtained directly or indirectly from a violation of the fourth amendment is not admissible against an accused at trial. However, the exclusionary sanction of this 'fruits of the

---

in the defendant's home on July 14, 2004 physically abused him or ate his food.

poisonous tree' doctrine has several exceptions, including the independent source rule and the inevitable discovery doctrine.") (citations omitted).

3.     The defendant has described the fruits of the illegal entry as: "the identity of Mr. Castillo, his presence at the house, his statements that he lived at the house, his statements evidencing knowledge of the cocaine in the house, and the cocaine itself" – all of which were described in paragraph 10 of the Stanton affidavit. *See* Motion To Suppress at 5; Defendant's Exh. 4 ¶ 10. This is, in my view, a fair description of the fruits of the illegal entry, all of that evidence having been obtained as a result of the illegal incursion into the home. *See United States v. Scott*, 270 F.3d 30, 44 (1st Cir. 2001) (evidence is "fruit" if "the illegality is at least the 'but for' cause of the discovery of the evidence.") (citation and internal quotation marks omitted)

4.     Even after excising from the Stanton affidavit information gleaned as a result of the illegal entry (*i.e.*, paragraph 10), the affidavit conveys probable cause to believe a search of 187 Pine would turn up evidence of the crime of illegal drug trafficking. The government hence carries its burden of demonstrating that evidence seized pursuant to the search warrant is admissible.

5.     With respect to tangible evidence seized prior to issuance of the search warrant – namely, the one or two cocaine baggies MacVane retrieved from the defendant's closet prior to seeking a warrant – the government carries its burden of proving inevitable discovery. This evidence hence is admissible.

6.     With respect to the remaining fruits of the illegal entry that the defendant has identified – officers' discovery of his presence in the house and his pre-warrant statements concerning his identity, the fact of his residence at 187 Pine and his knowledge of the presence of cocaine therein –

the government offers no relevant argument why an exception to the *Wong Sun* rule should obtain. That evidence accordingly is inadmissible.[7]

## A.  Illegal Entry

It is black-letter law that police may not invade the sanctity of a person's home without a search warrant absent both (i) probable cause to believe that evidence of a crime will be found within and (ii) exigent circumstances. *See, e.g., United States v. Samboy*, 433 F.3d 154, 158 (1st Cir. 2005) ("It is a well-established principle of Fourth Amendment law that warrantless searches inside a home are presumptively unreasonable.  Even with probable cause to believe that evidence of a crime will be found within a private dwelling, the constitutional protections afforded to an individual's privacy interest in his own home outweigh[] the government's interest in crime prevention.  Nevertheless, a warrantless entry into a person's dwelling may be permitted if 'exigent circumstances' arise.") (citations omitted).

As the First Circuit recently emphasized in a case highlighted at hearing by defense counsel, the practice of entering a dwelling to "freeze" (that is, secure) the scene pending grant of a search warrant falls considerably short of meeting this exacting standard:

> At least some members of the Boston Police Department may have mistakenly believed that they were free, absent a search warrant or exigent circumstances, to enter a dwelling in order to "freeze" the scene.  The district court was quite correct to state strongly that this is not the law:
>
>> There is no question that the police had no right to "freeze" the Quincy apartment where that meant entering it, looking around, searching, all the while ostensibly waiting for someone to get a warrant.  Nothing in First Circuit or Supreme Court case law remotely justifies such a step.  Nor should it.  Searching without a warrant, on the assumption that the

---

[7] I need not, and do not, reach the defendant's alternative bases for suppression: that (i) he was arrested without probable cause, (ii) he was not afforded the benefit of *Miranda* warnings, and (iii) his confession regarding cocaine and limited consent to search his closet were involuntary.  The defendant seeks no additional relief as a result of these alleged transgressions, and my conclusions regarding the validity of the search warrant and the applicability of exceptions to the *Wong Sun* exclusionary rule would not change were I to take them into consideration.

> magistrate will no doubt agree with the officers that there is probable
> cause to search that location at that time, makes a mockery of Fourth
> Amendment protection.  The warrant, and the review it requires, is
> reduced to a technicality.

*United States v. Dessesaure*, 429 F.3d 359, 370 (1st Cir. 2005) (quoting *United States v. Dessesaure*, 314 F. Supp.2d 81, 92 (D. Mass. 2004)).[8]

One is left with the unmistakable impression that in this case, as in *Dessesaure*, officers effectuated a warrantless entry of the defendant's home for the purpose of "freezing" a scene.  As the First Circuit observed in *Dessesaure*, the goal of a "freeze" is to secure a location to prevent destruction of evidence while a search warrant is being obtained.  *See id.* at 363.  This was precisely what officers intended to do at 187 Pine pending issuance of a search warrant.  Both Boucher and MacVane, key players on the day in question and credible witnesses, testified that upon regrouping following the roadside stop of the Tarmey vehicle the surveillance team decided to return to 187 Pine to "secure" it while applying for a search warrant.  Tellingly, Stanton stated in his search-warrant affidavit drafted later that day:

> Agents responded to 187 Pine Street to secure the residence in anticipation of a search
> warrant.  The residence was secured secondary to the large amount of pedestrian
> traffic in and out of the residence.  Agents feared that cocaine would continuously be
> distributed from 187 Pine Street, thus reducing the amount of cocaine/evidence at the
> residence and placing the community at greater risk.

Defendant's Exh. 4 ¶ 10.

The government struggles to cram this square peg into the round hole of exigent circumstances, relying on the well-recognized exigency of possible imminent destruction of evidence.  *See* Government's Objection to Defendant's Motion To Suppress, etc. ("Objection") (Docket No. 32) at 7-8.  Nonetheless, as the government itself notes, "The question 'is whether there is such a compelling

---

[8] This observation was dictum, the government not having challenged the district court's finding of illegal entry.  *See Dessesaure*, 429 F.3d at 365.  Nonetheless, one can confidently assume that were this issue squarely presented, the First Circuit would espouse the (*continued on next page*)

necessity for immediate action as will not brook the delay of obtaining a warrant.'" *Id.* at 7 (quoting *United States v. Cresta*, 825 F.2d 538, 553 (1st Cir. 1987)). Such compelling circumstances exist if officers have reason to believe that suspects or their confederates have "discovered the constable is closing in[.]" *United States v. Gerry*, 845 F.2d 34, 36 (1st Cir. 1988).

Here, in contrast to the imminent-destruction line of caselaw, the government has offered no evidence suggesting that officers could have harbored a reasonable belief that the defendant was aware they were closing in (for example, that he had recognized the surveillance van or had been tipped off to Tarmey's arrest) and, therefore, destruction of evidence likely was imminent. *Compare, e.g., Samboy,* 433 F.3d at 158-59 (exigency existed, justifying entry of defendant's apartment, when police knew drug courier had been arrested and therefore had not returned or contacted defendant and police received no response after knocking on defendant's door and announcing their presence); *Gerry,* 845 F.2d at 35-37 (exigency existed, justifying protective sweep, when officers heard noises believed to be human voices emanating from premises following arrest in vestibule of suspect in methamphetamine-manufacturing operation); *Cresta,* 825 F.2d at 552-53 (exigency existed, justifying warrantless entry of appellants' hotel room, when agents harbored reasonable belief that marijuana-distribution confederates arrested at different hotel had used two-way radio to warn appellants); *see also, e.g., United States v. Torres*, 274 F. Supp.2d 146, 156 (D.R.I. 2003) ("In narcotics cases in particular, the First Circuit and other courts have consistently found exigent circumstances to exist where there is *specific evidence* that a supplier of drugs has either detected police surveillance, or is acting nervously, or is expecting his confederate to return at a particular time and would therefore likely flee or dispose of the evidence if his arrested confederate did not return promptly. Where the Government wants to hang its hat, there is no hook. Specific evidence is simply not present in this

---

same view it went out of its way to proclaim in no uncertain terms in *Dessesaure*.

case.  No matter how hard this writer tries, there is simply no way to read the evidence presented by the Government as anything other than a generalized fear with no factual basis to support it.  This Court cannot and will not contort the record to find an exigency where none exists.") (citations and internal punctuation omitted) (emphasis in original).

The bottom line: Officers' forced entry of the defendant's home on July 14, 2004 for the purpose of "securing" it pending issuance of a search warrant contravened the dictates of the Fourth Amendment.

## B. Validity of Search Warrant

As the defendant observes, *see* Motion To Suppress at 5, 8-9, one consequence of the illegal entry effectuated in this case is that items seized pursuant to the search warrant are inadmissible unless the Stanton affidavit, purged of the tainted information, continues to supply probable cause for issuance of the warrant, *see, e.g., Dessesaure*, 429 F.3d at 367 ("[W]hen faced with a warrant containing information obtained pursuant to an illegal search, a reviewing court must excise the offending information and evaluate whether what remains is sufficient to establish probable cause."); *United States v. Woodward*, 173 F. Supp.2d 64, 67 (D. Me. 2001), *aff'd*, 43 Fed. Appx. 397 (1st Cir. 2002) ("When a court reviews an affidavit from which unconstitutionally seized evidence has been excised, it must independently determine if such probable cause remains within the affidavit that a neutral magistrate would have issued the subject warrants.") (citation omitted).[9]

Probable cause for issuance of a warrant "exists when the affidavit upon which a warrant is founded demonstrates in some trustworthy fashion the likelihood that an offense has been committed

---

[9] The First Circuit has left open the question whether any deference should be paid to an issuing magistrate's determination of probable cause in circumstances in which the reviewing court expunges information from a search-warrant affidavit after the fact.  *See Dessesaure*, 429 F.3d at 368 n.8.  Here, as in *Dessesaure*, I have given the defendant the benefit of the rule favorable to him and have not relied on any presumption in favor of the correctness of the decision to issue the warrant based on the Stanton affidavit as originally presented.  *See id.*

and that there is sound reason to believe that a particular search will turn up evidence of it." *United States v. Schaefer*, 87 F.3d 562, 565 (1st Cir. 1996) (citation and internal quotation marks omitted). The issuing magistrate must look to "the totality of the circumstances indicated [within the four corners of] a supporting affidavit" to assess the existence *vel non* of probable cause. *Id*. I readily conclude that, even with paragraph 10 excised, a neutral magistrate still would have issued the warrant in question here. Even as redacted, the Stanton affidavit conveys that:

1. Boucher had learned from a confidential source that two males of Dominican descent were selling large amount of cocaine from 187 Pine. *See* Defendant's Exh. 4 ¶ 2.

2. Boucher had received information from persons living in the vicinity of 187 Pine that there was an unusual amount of vehicular and pedestrian traffic there, with people visiting only for short periods of time and arriving at all hours of the day and night – activity that Stanton believed, consistent with his training, education and experience, was consistent with drug trafficking. *See id*. ¶ 3.

3. Stanton and other officers had conducted surveillance of 187 Pine earlier that day, during which they had observed a white male entering 187 Pine through its main entryway and exiting the residence approximately three minutes later, carrying what appeared to be a plastic baggie. *See id*. ¶¶ 4-6.

4. Officers followed the car carrying the male, observing traffic violations for which the car was stopped at the corner of Main and Middle streets by an LPD officer. *See id*. ¶ 7. MacVane observed the white male moving about the interior of the vehicle in a furtive manner, consistent with concealing evidence or weapons. *See id*. ¶ 8. He ordered the white male to get out of the vehicle and turn over his cocaine. *See id*. The male said the cocaine was in his pocket, and MacVane recovered

approximately one gram of cocaine.  *See id*.  The male told agents he had purchased the cocaine during

his recent brief visit to 187 Pine from a dark-skinned male for $20.  *See id*. ¶ 9.

5.      A Maine Drug Enforcement Agency ("MDEA") agent had advised Stanton that the

white male was known to the MDEA as being involved with the distribution of cocaine and cocaine

base in the Lewiston-Auburn area.  *See id*. ¶ 11.

6.      On or about July 12, 2004 Stanton had received information from an anonymous source

that a Dominican male at 187 Pine was trafficking drugs and was in possession of a firearm.  *See id*.¶

12.

The defendant posits that, in the absence of information concerning informants' reliability,

there is insufficient information to support probable cause for a search of the house.  *See* Motion To

Suppress at 8-9.  However, as the First Circuit has observed, an affiant need not necessarily assess (or

otherwise vouch for) the credibility of informants to demonstrate probable cause for issuance of a

warrant.  *See, e.g., Schaefer*, 87 F.3d at 566 ("[A]n informant's tales need not invariably be buttressed

by extensive encomia to his veracity or detailed discussions of the source of his knowledge.  While an

informant's truthfulness and basis of knowledge are highly relevant in determining the value of his

report, the [Supreme] Court has cautioned that these elements should [not] be understood as entirely

separate and independent requirements to be rigidly exacted in every case.") (citation and internal

quotation marks omitted); *see also, e.g., United States v. Spinosa*, 982 F.2d 620, 626 (1st Cir. 1992)

("The affidavit must be viewed in its entirety, and must be given a common-sense and realistic, rather

than a hypertechnical interpretation.") (citations and internal quotation marks omitted).

The Stanton affidavit, viewed in its entirety as excised, contains more than unverified and

uncorroborated tips.  It reflects the reports of several separate anonymous sources (whose reports

tended to corroborate each other) that 187 Pine was the site of cocaine-dealing activity or, at the least,

19

of activities strongly suggestive of drug-trafficking.  Some of these reports were revealed to have come from ordinary citizens, who seemingly would have had no motivation to fabricate their complaints.  As a capper, the Stanton affidavit reveals that police (i) conducted surveillance of 187 Pine, (ii) observed a white male enter and exit that premises within a three-minute time span carrying what appeared to be a plastic baggie, (iii) stopped and questioned the white male, retrieving from him a plastic baggie containing cocaine, and (iv) obtained from him a confession that he had just purchased the cocaine at 187 Pine.  This information, in its totality, connects the dots sufficiently to demonstrate the likelihood that (i) the offense of cocaine-trafficking had been committed, and (ii) there was sound reason to believe that a search of 187 Pine would turn up evidence of that offense.  *See, e.g., United States v. Vongkaysone*, 434 F.3d 68, 74 (1st Cir. 2006) (officers had probable cause to arrest two suspects when informant whose reliability previously had been untested made statement against interest, bolstering his credibility, and officers' own surveillance largely corroborated his tip).

Evidence officers seized pursuant to the search warrant accordingly is admissible.[10]

### C.  Cocaine Discovered as Fruit of Illegal Entry

With respect to cocaine seized by MacVane from the defendant's closet prior to issuance of the warrant, the government invokes the so-called "inevitable discovery" exception to the *Wong Sun* exclusionary rule, *see* Objection at 19-21, which "recognizes that, if the evidence would have been discovered lawfully, the deterrence rationale has so little basis that the evidence should be received[,]" *United States v. Almeida*, 434 F.3d 25, 28 (1st Cir. 2006) (citation and internal quotation marks omitted).

---

[10] The First Circuit has recognized that there is a second prong to analysis of the question whether evidence seized pursuant to a search warrant obtained subsequent to a Fourth Amendment violation is admissible – whether the warrant would have been sought absent the illegality.  *See Dessesaure*, 429 F.3d at 369-70.  For reasons discussed below, I conclude that officers in this case would have sought the warrant absent the illegal entry.

The government bears the burden of proving, by a preponderance of the evidence, that the inevitable-discovery exception applies. *See, e.g., Scott*, 270 F.3d at 42. "The prosecution may not rely on speculation but rather must meet this burden of proof based on demonstrated historical facts capable of ready verification or impeachment." *United States v. Ford*, 22 F.3d 374, 377 (1st Cir. 1994) (citation and internal quotation marks omitted). In analyzing whether the prosecution has met this burden, a court asks "three questions: first, whether the legal means by which the evidence would have been discovered was truly independent; second, whether the use of the legal means would have inevitably led to the discovery of the evidence; and third, whether applying the inevitable discovery rule would either provide an incentive for police misconduct or significantly weaken constitutional protections." *Almeida*, 434 F.3d at 28.

The government argues that, even apart from any illegal entry, officers in this case would have obtained a search warrant pursuant to which they inevitably would have discovered the cocaine that MacVane initially seized from the defendant's closet. *See* Objection at 19-20. I agree.

The First Circuit has declined to impose a "bright-line rule" that police need have been actively pursuing a warrant at the time of an illegal search (or entry) to satisfy the requirement that the legal means on which they rely (the warrant) be "truly independent" of the illegal conduct. *Ford*, 22 F.3d at 378. Nonetheless, the First Circuit has queried whether officers still would have sought a warrant independent of the illegal entry (in other words, whether officers were prompted to seek a warrant as a result of observations made during such an entry). *See Dessesaure*, 429 F.3d at 369. In addition, the First Circuit has required "that probable cause be present prior to the illegal search to ensure both independence and inevitability for the prewarrant search situation." *Ford*, 22 F.3d at 378 (citation and internal punctuation omitted).

In this case, although officers were not actively pursuing a warrant at the time of the illegal entry, I credit the testimony of MacVane and Boucher that the decision to seek the warrant was made during a brief meeting of the surveillance team immediately following the Tarmey vehicle stop. Further, as I have already concluded, a warrant would have issued based on the Stanton affidavit even with the tainted information expunged. Thus, I am satisfied that, absent the illegal entry, officers still would have sought a search warrant, and the warrant application would have been granted. The search warrant thus constitutes a "truly independent" means by which the evidence in question would have been found. *See Ford*, 22 F.3d at 378 ("It is inevitable that the existence of probable cause would find fruition in the issuance of a search warrant. This is bolstered by the fact that there is evidence in the record, relied upon by the district court, that a decision to seek a warrant had been made prior to the warrantless entry.").

Further, the government has met its burden of establishing that the cocaine in question inevitably would have been discovered. Following issuance of the warrant, a thorough search was in fact undertaken. Even had the illegal entry not transpired, and even had the defendant not conveyed information regarding the whereabouts of cocaine, his bedroom closet would have been searched. The cocaine MacVane seized pre-warrant then inevitably would have been discovered, MacVane having found it upon a cursory initial examination of the closet's contents.

I turn to the final question: whether application of the rule in this case would weaken Fourth Amendment protections and encourage police misconduct. I find that it would not. As the First Circuit has observed, this question is answered in the negative "where applying the exception would not act as an incentive to unconstitutional behavior[.]" *Almeida*, 434 F.3d at 29 (citation and internal quotation marks omitted). This, in turn, is the case when the officers could have and would have, by lawful means, achieved the same end that they accomplished by unlawful ones. *See id.* ("Because, as

discussed above, the officers would have eventually seized the drugs by arresting Almeida (as they had planned to do before questioning him), they had little incentive to try to obtain the crack through unconstitutional means when a lawful means was readily available."). So, too, here. Inasmuch as appears, in this case officers labored under the misapprehension that securing a dwelling pending issuance of a search warrant is a lawful practice. This decision makes crystal-clear that it is not. Here, as in *Almeida*, officers had means at their disposal to achieve their ends lawfully: They could have applied for a search warrant prior to entry, it would have been granted, and they could have then permissibly entered the dwelling, forcibly if necessary, whereupon they would have discovered the cocaine in the closet. They have every incentive, in the future, to follow a lawful path in circumstances such as these.

Nor, finally, was the conduct of officers in this case otherwise so egregious as to justify denial of the inevitable-discovery exception. The First Circuit in *Ford* noted that it had been able to find only one case, *United States v. Rullo*, 748 F. Supp. 36 (D. Mass. 1990), in which a court had declined to apply the inevitable-discovery exception on the basis of creation of an incentive for police misconduct. *See Ford*, 22 F.3d at 380. In that case, the First Circuit observed, police had used excessive physical force to compel a suspect to disclose the location of a gun. *See id*. Although, in this case, the defendant asserted in his memorandum that officers were physically abusive, rude (eating his food without his permission) and threatened to arrest his girlfriend and place his children in foster care if he did not agree to speak with them, *see* Motion To Suppress at 2-3, no evidence of any such conduct was adduced at hearing.

For the foregoing reasons, I am satisfied that the government carries its burden of showing that the cocaine discovered by MacVane pre-warrant is admissible pursuant to the inevitable-discovery exception.

### D. Remaining Fruits of Illegal Entry

I turn finally to the question whether pre-warrant fruits of the illegal entry apart from tangible evidence are admissible at trial.  I readily conclude that they are not.  As noted above, the burden rests on the government to demonstrate the applicability of an exception to the *Wong Sun* exclusionary rule.  *See, e.g., Rivas*, 157 F.3d at 368.  The government raised only one such argument – inevitable discovery – via which it explicitly sought admission only of tangible evidence.  *See* Objection at 20 (describing warrant as "an alternative avenue that would have led to discovery of cocaine").  Even assuming *arguendo* that the government's brief could be construed as addressing intangibles (*i.e.*, the fact of the defendant's presence in the house and his oral statements), it is questionable whether the concept of inevitable discovery can comfortably be stretched to fit such evidence:

> In response to our inquiry, the government was unable to cite to any decision in which the inevitable discovery doctrine was applied to admit statements, as distinguished from physical evidence.  While we know of no articulation of the inevitable discovery doctrine that restricts its application to physical evidence, and we are not prepared in this case to enunciate such a condition, it is patent why cases have generally, if not always, been so limited.  A tangible object is hard evidence, and absent its removal will remain where left until discovered.  In contrast, a statement not yet made is, by its very nature, evanescent and ephemeral.  Should the conditions under which it was made change, even but a little, there could be no assurance the statement would be the same.

*United States v. Vasquez de Reyes*, 149 F.3d 192, 195-96 (3d Cir. 1998); *see also, e.g., United States v. White*, 339 F. Supp.2d 1165, 1176-77 & n.56 (D. Kan. 2004) (government's assertion that statement admissible under rubric of inevitable discovery misplaced; doctrine applies to physical evidence, not statements).  Assumedly for this reason, courts have applied a related but analytically distinct test in analyzing whether statements are admissible in the face of the exclusionary rule, querying whether the circumstances were such as to dissipate the taint of the violation:

> Since Kaupp was arrested before he was questioned, and because the State does not even claim that the sheriff's department had probable cause to detain him at that point, well-established precedent requires suppression of the confession unless

that confession was an act of free will sufficient to purge the primary taint of the unlawful invasion.   Demonstrating such purgation is, of course, a function of circumstantial evidence, with the burden of persuasion on the State.   Relevant considerations include observance of *Miranda*, the temporal proximity of the arrest and the confession, the presence of intervening circumstances, and, particularly, the purpose and flagrancy of the official misconduct.

*Kaupp v. Texas,* 538 U.S. 626, 632-33 (2003) (citations and internal punctuation omitted).

While the government does assert, in response to the defendant's claims that he was not administered *Miranda* warnings and that his confession was involuntary, that he was read his *Miranda* rights, which he voluntarily, knowingly and intelligently waived, and that he voluntarily confessed and consented to a limited search of his closet, *see* Objection at 16-21, the government makes no argument that the taint of any illegal entry had dissipated sufficiently to permit admission of the defendant's statements or evidence of discovery of his presence at the house.[11]   Inasmuch as the government, which bears the burden on this issue, has articulated no basis for admissibility of intangible fruits of any illegal entry, that evidence must be suppressed.   *See, e.g., United States v. Patino*, 830 F.2d 1413, 1418-19 (7th Cir. 1987) (holding, in case in which government argued that defendant had consented to agents' presence in her house for two hours following illegal entry but failed to "address the fruit-of-the-poisonous tree issue, despite the fact it has the burden on this issue[,]" that government failed to carry burden of showing "a sufficient break in events to undermine the inference that the confession was caused by the Fourth Amendment violation"; given intimidating display of illegal force, defendant's submissive reactions might well have been triggered by illegal entry) (citations and internal quotation marks omitted).

---

[11] It is doubtful that, if the government had advanced such an argument, it would have been successful.  In circumstances such as this, in which a statement or consent to search has been extracted immediately following an illegal forcible entry, the giving of a *Miranda* warning has been held insufficient to purge the taint of that entry.  *See, e.g., United States v. Robeles-Ortega*, 348 F.3d 679, 684 (7th Cir. 2003) ("There is no reason in this case to believe that [the defendant's] written consent was independent of the illegal entry. It was obtained almost immediately after that forcible entry into the home and subsequent show of force.  As with confessions given after *Miranda* warnings, that consent alone does not necessarily purge the taint of the illegal action.").

### III.  Conclusion

For the foregoing reasons, I recommend that the Motion To Suppress be **GRANTED** in part and **DENIED** in part.  If this recommended decision is adopted, the following evidence will be inadmissible at trial in this matter: (i) the fact of officers' discovery of the defendant's presence at 187 Pine on July 14, 2004, and (ii) statements the defendant made to officers that day in his residence, prior to a search thereof pursuant to warrant, concerning his identity, the fact of his residence at 187 Pine and his knowledge of the presence of cocaine in the house.

### *NOTICE*

*A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. § 636(b)(1)(B) for which de novo review by the district court is sought, together with a supporting memorandum and request for oral argument before the district judge, if any is sought, within ten (10) days after being served with a copy thereof.   A responsive memorandum and any request for oral argument before the district judge shall be filed within ten (10) days after the filing of the objection.*

*Failure to file a timely objection shall constitute a waiver of the right to de novo review by the district court and to appeal the district court's order.*

Dated this 1st day of March, 2006.

/s/ David M. Cohen
David M. Cohen
United States Magistrate Judge